Christopher A. Sproul (Cal. Bar No. 126398)
Molly Coyne (Cal. Bar No. 312914)
Heather Kryczka (Cal. Bar No. 314401)
Environmental Advocates
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com
Email: mcoyne@enviroadvocates.com
Email: heather@enviroadvocates.com

Jason Weiner (Cal. Bar No. 259264)
Geneva EB Thompson (Cal. Bar No. 315725)
Wishtoyo Foundation and its Ventura Coastkeeper Program
9452 Telephone Road #432
Ventura, CA 93004
Telephone: (805) 823-3301
Facsimile: (805) 258-5107
Email: jweiner.venturacoastkeeper@wishtoyo.org
Email: gthompson@wishtoyo.org

Attorneys for Plaintiffs
WISHTOYO FOUNDATION and CENTER FOR BIOLOGICAL DIVERSITY
*Additional Counsel Listed on Next Page*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WISHTOYO FOUNDATION, CENTER FOR BIOLOGICAL DIVERSITY, and VENTURA COASTKEEPER, a program of WISHTOYO FOUNDATION,<br><br>Plaintiffs,<br>v.<br><br>UNITED WATER CONSERVATION DISTRICT,<br><br>Defendant. | Case No: 2:16-cv-03869-DOC-PLA<br><br>**DECLARATION OF CHRISTOPHER SPROUL IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS** |

*Additional Counsel for Plaintiffs*

John Buse (Cal. Bar No. 163156)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7125
Fax: (510) 844-7150
jbuse@biologicaldiversity.org

Patricia Linn (Cal. Bar No. 253015)
Law Office of Patricia Linn
115 Oakdale Avenue
Mill Valley, CA 94941
Telephone: (415) 388-2303
Email: patricialinn19@gmail.com

I, Christopher Sproul, hereby declare under penalty of perjury that the following is true and correct, that I have personal knowledge of the following, and if called as a witness, I could and would testify competently thereto:

1. I have reviewed Defendant's Evidentiary Objections to Evidence Plaintiffs Submitted in Support of Motion for Attorneys' Fees and Costs (Dkt. 275-3) ("Defendant's Evidentiary Objections") and I am aware that Defendant United Water Conservation District ("United") seeks to have Exhibit 2 (Dkts. 264-1, 264-2) to my opening declaration, Declaration of Christopher Sproul in Support of Plaintiffs' Motion for Attorneys' Fees and Costs (Dkt. 263) ("Sproul Opening Declaration") stricken from evidence. In this Exhibit 2, as explained in paragraph 14 of the Sproul Opening Declaration, I set forth the records of my time on this case for which I am seeking attorney fee recovery. Defendant's Evidentiary Objections (at ¶ 55) contends Exhibit 2 should be stricken from evidence because I did not state under penalty of perjury that the attached records are true and correct copies of contemporaneous records in this case. However, in the Sproul Opening Declaration, I did state (on the last page my declaration immediately above my signature) "I declare, under penalty of perjury, that the foregoing is true and correct." In paragraph 14 of this declaration, I further stated (effectively under penalty of perjury) that Exhibit 2 constituted "my own time records." In this paragraph 14 and elsewhere in the Sproul Opening Declaration, I made plain that I had reviewed the time records that I (and my co-counsel) kept in this case and revised them to cut some time for billing judgment, to redact certain information to protect my clients' privileges and to ensure clarity presentation (by, for example, correcting typographical errors or clarifying wording to make the entry easily understood by United and the Court). Sproul Opening Declaration ¶¶ 17, 62, 78-86. In context, I thought I had made it obvious that I was reviewing contemporaneously kept records for this task. In any case, to the extent that this is now necessary: I kept contemporaneous records of my time on this case using a computer legal billing software program. To prepare Exhibit 2, I reviewed the many individual entries produced by this legal billing software program. I then made some

revisions to these entries to reduce or in some cases eliminate some of the time in these entries for billing judgment, to redact certain privileged information (as indicated), and to make minor wording changes to improve the ability for United and the Court to understand the entries (such as by correcting typographical errors or otherwise clarifying the language of these entries).

### I. Plaintiffs' Additional Time and Costs Incurred Since Their Opening Fees Motion.

2. I indicated in paragraph 14 of the Sproul Opening Declaration that the lodestar summary spreadsheet that I had attached as Exhibit 1 to the declaration summarized the claimed attorney lodestars for work performed by Plaintiffs' counsel and paralegals in this case up through December 21, 2018. I indicated that additional attorney work required to complete briefing on this Motion for Attorneys Fees, including Plaintiffs' reply briefing, would be documented in subsequent declarations submitted on reply. The attached Exhibit 1 to this reply declaration is an updated lodestar summary spreadsheet setting forth the grand total of attorneys fees sought by Plaintiffs that includes the hours Plaintiffs originally sought recovery for in their Opening Motion for Attorneys Fees (minus the additional billing judgment cuts that Plaintiffs are agreeing to in response to the objections in the Ogle Declaration) plus the additional hours Plaintiffs are seeking to recover for work done after December 21, 2018. As indicated in the attached Exhibit 1, Plaintiffs are seeking a revised total of $ 3,199,907.97 in attorneys fees.

3. I have attached as Exhibit 2 to this reply declaration my own supplemental time records for work done after December 21, 2018 for which Plaintiffs are seeking recovery. I kept contemporaneous records of the supplemental time in issue using a computer legal billing software program. To prepare Exhibit 2, I reviewed the many individual entries produced by this legal billing software program. I then made some revisions to these entries to reduce or in some cases eliminate some of the time in these entries for billing judgment, to redact certain privileged information (as indicated), and to

make minor wording changes to improve the ability for United and the Court to understand the entries (such as by correcting typographical errors or otherwise clarifying the language of these entries). As depicted in Exhibit 2, I have cut some of my hours worked during this time period in exercise of billing judgment.

4. As indicated in Exhibit 2, I have incurred additional hours on the following four types of tasks: (1) completing Plaintiffs' opening Motion for Fees and Costs and associated declarations and exhibits and Plaintiffs' Reply in Support of Plaintiffs' Motion for Fees and Costs and associated declarations and exhibits, (2) attempted settlement negotiations with United regarding Plaintiffs' fees and costs, (3) discussions with United concerning potential consensus/agreement between the parties on Vern Freeman Diversion Dam Steelhead passage alternatives (that might persuade United not to pursue an appeal in this case and that might allow the parties to have consensus views in the Special Master process concerning United's compliance with the Court's post-trial injunction), and (4) reviewing technical materials and consulting with Plaintiffs' experts to be prepared to represent Plaintiffs in the Judge Smith Special Master process.

5. I indicated in paragraph 160 of the Sproul Opening Declaration that Plaintiffs had $290,616.26 in case costs incurred through December 21, 2018. I itemized these costs in a spreadsheet attached as Exhibit 4 to my Opening Declaration. I further indicated that additional costs required to complete briefing on this Motion for Attorneys Fees, including Plaintiffs' reply briefing, would be documented in subsequent declarations submitted on reply. Plaintiffs have incurred additional expenses for the court courtesy copies of their opening Motion for Attorneys Fees and Costs and related documents and for their expert Chris Hammersmark to assist Plaintiffs in evaluation of technical materials concerning Vern Freeman Dam fish passage alternatives that United submitted to Plaintiffs as part of United's attempts to secure an agreement with Plaintiffs about these fish passage alternatives. The concurrently filed Weiner Reply Declaration documents this additional expense of $6712.50. With this additional expense, Plaintiffs' total case costs are $297,328.76.

## II. Plaintiffs' Response to United's Objections to Plaintiffs' Hours

6. I have reviewed the Declaration of Shawn M. Ogle in Support of Defendant's Opposition to the Plaintiffs' Motion for Attorneys' Fees and Costs (Dkt. 275-2) ("Ogle Declaration"). The Ogle Declaration sets forth United's objections to specified hours claimed by Plaintiffs for fee recovery. In several attached exhibits, the Ogle Declaration color codes certain entries in Plaintiffs' records for time that United contends should be denied recovery or only awarded reduced recovery. The Ogle Declaration, with its exhibits, is 695 pages long and sets forth hundreds of objections to individual time entries in my records and the records of my several co-counsel. It took me many hours to read through the Ogle Declaration's line by line objections to my time records and its objections to my co-counsel's records and draft my own line by line responses to these objections, draft line by line responses to some of the objections to my co-counsel, and provide advice to my co-counsel concerning their additional line by line responses. In my attached Exhibit 4 to this reply declaration, I have written line by line responses to the Ogle Declaration's objections to certain of my time entries (which are set forth in Exhibit 1 to the Ogle Declaration). As indicated in my Exhibit 4, I have agreed with a few of United's objections and I have cut a few of my time entries accordingly. For the most part, however, for the reasons explained in my line by line responses, I have disagreed with United's contentions that my hours should be reduced.

7. In my attached Exhibit 5, I have further written Plaintiffs' line by line responses to the Ogle Declaration's objections to certain time entries for the work of my co-counsel Anthony Barnes on this case. In my attached Exhibit 6, I have further written Plaintiffs' line by line responses to the Ogle Declaration's objections to certain time entries for the work of my co-counsel John Buse on this case. In my attached Exhibit 7, I have further written Plaintiffs' line by line responses to the Ogle Declaration's objections to certain time entries for the work of my co-counsel Naomi Melver on this case. In my attached Exhibit 8, I have further written Plaintiffs' line by line responses to the Ogle Declaration's objections to certain time entries for the work of my co-counsel Stephanie

Oxley on this case. In my attached Exhibit 9, I have further written Plaintiffs' line by line responses to the Ogle Declaration's objections to certain time entries for the work of my co-counsel Danielle Rathje on this case. In my attached Exhibit 10, I have further written Plaintiffs' line by line responses to the Ogle Declaration's objections to certain time entries for the work of Plaintiffs' contract paralegal Dawn Edberg on this case. As indicated in these exhibits, Plaintiffs have agreed with a few of United's objections and have cut a few of their counsel's time entries accordingly. For the most part, however, for the reasons explained in my line by line responses, Plaintiffs have disagreed with United's contentions concerning reductions in their counsel's hours.

8.  As noted, while generally disagreeing with United, Plaintiffs have agreed with some of the reductions in their billable hours and lodestar recoveries set forth in the Ogle Declaration and have exercised further billing judgment reductions accordingly. For example, the Ogle Declaration states that despite conceding they did not prevail on their Flycatcher claim, Plaintiffs nonetheless failed to remove all of their time spent on this claim from their opening time records. Ogle Decl. ¶¶ 6-36, Exs. 1-13 (The Ogle Decl. codes records that it contends fall into this category in orange). I, and, at my direction, my co-counsel have reviewed United's orange color coding and come to agree that some of these records were inadvertently not removed. In Plaintiffs' line by line responses to the Ogle Declaration (such as my Exhibit 4 to this reply declaration), we have identified the entries that we agree with United should be cut. In the attached Exhibit 3, I have set forth a summary spreadsheet which indicates lawyer by lawyer how many hours and the total lodestar amounts that Plaintiffs are agreeing to reduce to reflect United's Ogle Declaration objections. In the total lodestar calculations set forth in Exhibit 1 to this reply declaration, I have subtracted from Plaintiffs' lodestar recovery all hours that we are conceding (as documented in my Exhibit 3) should have been cut.

9.  I am aware that the Ogle Declaration seeks to reduce Mr. Weiner's hours with contentions that some of his work was not in the capacity as an attorney performing necessary litigation tasks in this case, but as in-house liaison between me and potentially

other outside counsel (the Ogle Declaration codes these hours in blue in its accompanying spreadsheet, Ex. 13). As the lead counsel who directed this case, I have personal knowledge concerning what Mr. Weiner did in fact do. Rather than serving as a liaison between me or other outside counsel and Executive Director Mati Waiya and the Wishtoyo Board of Directors, he served as my main co-counsel throughout the case and worked at my direction on all the key aspects of this case. Specifically, we worked in concert on all of the following: (1), gathering the initial evidence and evaluating whether Plaintiffs had viable ESA claims to assert against United and advising the clients concerning the same, (2), fashioning the mandatory 60 day citizen suit notice letter and follow on complaint, (3), engaging in prefiling consultation with United about the potential lawsuit, including the potential of settling Plaintiffs' claims without filing suit, (4), continuing to gather potential evidence from documents and oral interviews through formal written discovery on United, third-party subpoenas, and depositions; Freedom of Information Act requests to NMFS, and informal request for information from various third parties, (5), ongoing attempts to develop, convey and negotiate settlement proposals to United, (6), recruiting, interviewing, and retaining expert witnesses and subsequently working with these experts to provide them pertinent factual evidence Plaintiffs had obtained and to brainstorm with him about their opinion work products needed in the case, (7), responding to United's extensive discovery propounded on Plaintiffs, (8), assisting with mandatory case management matters such as case management reports, Rule 26(f) meetings with opposing counsel, attending case management conferences, tracking case work products needed and management of Plaintiffs' litigation team to ensure timely production of work products, (9), drafting and appearing in court to argue multiple complex pretrial motions (including motions for summary judgment and preliminary injunction with voluminous exhibits, United evidentiary objections to respond to, and United counter evidence to object to), (10), preparing for and attending the pretrial conference--including detailed work with United concerning trial witness and exhibit lists, (11), working with Plaintiffs' numerous trial witnesses to prepare them to

testify, (12), identifying which exhibits to seek to introduce into evidence at trial and what questions to pose to various witnesses concerning the numerous exhibits, (13), conducting trial, including managing witnesses and documents and developing lines of questioning, (14), producing the detailed trial related documents including very lengthy findings of fact and conclusions of law, (15), working on post-trial matters including the special master process and potential further settlement discussion with United of fees and costs and potential appeal issues, and (16) producing Plaintiffs' attorneys fees and costs motion. Mr. Weiner occasionally met, had phone calls or exchanged email messages with Mr. Waiya and other Wishtoyo Board Members. But in so doing, he was not simply conveying as a liaison the work done by me and other outside counsel. I either participated in these communications directly or planned them with Mr. Weiner and learned about their outcomes from his subsequent briefings. In these communications, Mr. Weiner by himself or Mr. Weiner and I together would inform Wishtoyo client representatives of the work that we were doing, our assessment of likely litigation outcomes, documents or information we would need from them to respond to United's discovery, the nature of the remedies we intended to pursue on their behalf, and our advice concerning settlement approaches. We would seek Mr. Waiya and/or the Board's authority to implement our recommendations concerning litigation positions on remedy and settlement proposals to United. Mr. Weiner's role in these discussions was thus not as a mouthpiece for outside counsel, but as an active litigating attorney/co-counsel seeking necessary direction from the client.

10.     One of the key co-counsel roles I assigned to Mr. Weiner was tracking and developing the most in-depth knowledge among Plaintiffs' legal team concerning the factual record (including both from documents and from witness interviews). Given the sheer volume of documents acquired from United in discovery, from third parties via subpoena, from NMFS in response to FOIA requests, technical materials from our experts, and other third parties informally, it was impossible for me to review the entire universe of relevant documents. I needed Mr. Weiner to read and come to understand as

many of the documents himself as possible (and to work with me to get supplemental assistance from Ms. Thompson) to be sure that we had flagged and analyzed either by ourselves or with our experts the most probative material. I relied on Mr. Weiner to direct me to the subset of this most probative material, to provide me initial insights into why the material was probative, and to summarize other documents that I could not read myself. Mr. Weiner's review, analysis, and organization of the documents I further relied on was important substantive legal work critical to my functioning as lead counsel, certainly not the work of a mere liaison between outside counsel and the client. I further directed Mr. Weiner to interview potential fact (such as standing) and expert witnesses, at least initially, and brief me on the additional potential evidentiary value of these witnesses' testimonies. This was also important, and cost-effective, work for honing my presentation of the case as lead counsel.

11. As part of his role leading or co-leading Plaintiffs' evidence gathering/record building efforts, Mr. Weiner's role included leading Plaintiffs' outreach to NMFS and Plaintiffs' use of documents and oral statements obtained from NMFS to support, inform, and develop Plaintiffs' claims, remedies, and settlement positions. Plaintiffs appropriately sought NMFS's views and information on the technical issues related to United's impact on Steelhead given the agency's legal authority to regulate United, and demonstrated in-depth knowledge and documented findings concerning these topics. Plaintiffs correctly anticipated that NMFS's views and information in its possession would be a matter of great concern to the Court and impact the content and effectiveness of Plaintiffs' evidence and arguments in Court. Indeed, the Court requested testimony and an *amicus* brief from NMFS and widely cited NMFS's statements in its post-trial decision. *Wishtoyo Found. v. United Water Conservation Dist.*, No. 16-3869, 2018 U.S. Dist. LEXIS 174505 (Sept. 23, 2018). Accordingly, Plaintiffs sought to learn these views and obtain this information themselves in fashioning case strategy, developing evidence and arguments to support their take claims, developing remedial measures to seek, and crafting settlement positions. Mr. Weiner conducting this task was

1 both necessary for Plaintiffs' litigation efforts and cost-effective giving his lower billing
2 rate than me and my inability to do all case tasks alone.

3     12. I note that the Ogle Declaration contends that Plaintiffs should not recover
4 for duplicative work, which the Ogle Declaration codes in green in its accompanying
5 spreadsheets. Ogle Decl. ¶¶ 6-36, Exs. 1-13. Along these lines, the Ogle Declaration
6 contends Plaintiffs should not recover for time I spent reviewing or revising documents
7 initially drafted by Mr. Weiner, Ms. Thompson or other junior lawyers, or that Mr.
8 Weiner should not recover for time spent reviewing or suggesting revisions to documents
9 that I initially drafted. However, as lead senior counsel, I assigned Mr. Weiner, and for a
10 particular subset of correspondence documents from NMFS repeatedly complaining to
11 United of the latter's foot-dragging, Ms. Thompson, the task of reviewing and thoroughly
12 digesting all or nearly all of the onslaught of documents Plaintiffs acquired from United
13 in discovery or from NMFS under FOIA. Plaintiffs' material evidence was drawn from
14 these documents, but obviously it would not be necessary nor feasible to introduce all of
15 these documents into evidence. A crucial task was to winnow the documents down to a
16 nonrepetitive, manageable set of core documents necessary to prove the material facts set
17 forth in Plaintiffs ultimately largely successful Findings of Fact. I concluded it was both
18 necessary and cost-effective for Plaintiffs to assign these tasks to Mr. Weiner and Ms.
19 Thompson. One, they bill at substantially lower rates than me. Two, the volume of
20 documents involved combined with the crush of other litigation obligations made it
21 impossible for me to do this review by myself. Obviously, I could not benefit from the
22 reviews done by Mr. Weiner and Ms. Thompson without extensive written and oral
23 communications with them about what they had learned. Furthermore, given their greater
24 familiarity with the documents creating the key evidence in this case, it was incumbent
25 upon me to run drafts of various documents by them to ensure that the documents were
26 consistent with the documentary record and reflected all the key facts in this record--and
27 to request their edits as appropriate. Conversely, it was appropriate for me to direct Mr.
28 Weiner, Ms. Thompson or other attorneys to initially draft certain documents, especially

the fact statement portions of certain documents given Mr. Weiner and/or Ms. Thompson's more in-depth knowledge of the documentary record. I further concluded that I needed to review and revise these drafts to reflect my unique role and skill set: the senior lawyer with by far the most extensive trial and motion practice experience. It was my role to focus Plaintiffs' factual and legal arguments strategically to those most important and most persuasive--to ensure that the Court was not burdened with material ultimately not crucial to Plaintiffs' prevailing arguments and to maximize Plaintiffs' chances of prevailing.

13. Plaintiffs' further responses to the Ogle Declaration's contentions concerning reductions in the hours claimed by Jason Weiner and Geneva Thompson are set forth in the concurrently filed Reply Declaration of Jason Weiner in Support of Plaintiffs' Motion for Attorneys Fees and Costs. Plaintiffs' responses to the Ogle Declaration's contentions concerning reductions in the hours claimed by Patricia Linn, Heather Kryczka, Jodene Isaacs and Molly Coyne are set forth in concurrently filed reply declarations from each of them.

## III. Plaintiffs' Supporting Data for Their Hourly Rates

14. I am aware that United criticizes my rate-setting methodology as relying on the rates awarded to practitioners in large law firms, which United implies may be higher than those appropriately awarded to Plaintiffs' counsel as small firm. However, many of the rates awarded to attorneys that I relied on in my opening Sproul Declaration were to attorneys in small "boutique" law firms of less than ten attorneys. For example, all of the lawyers in these cases were from such small firms:

--*Nozzi v. Hous. Auth.*, No. CV 07-380 PA (FFMx), 2018 U.S. Dist. LEXIS 26049 (C.D. Cal. Feb. 15, 2018) awarded Paul Hughes, a 9 year attorney, $730/hour.

--*Rodriguez v. County of Los Angeles*, No. 2:10-cv-06342-CBM-AJW (C.D. Cal. December 29, 2014), awarded Kevin LaHue, a 10 year attorney, $600/hour as a 2014 rate.

-- *Metrow v. Liberty Mut. Managed Care LLC*, No. EDCV 16-01133 JGB (KKx),

2018 U.S. Dist. LEXIS 100835 (C.D. Cal. June 14, 2018) awarded Aparajit Bhowmik, a 12 year attorney, $695/hour; Aarin Ziff, a 12 year attorney $500 per hour and Piya Mukherjee, an 8 year attorney, $475/hour.

15. The data in my opening Sproul Declaration indicates that the rates awarded to attorneys from smaller firms are generally comparable to the rates awarded attorneys from larger firms. Indeed, this has been my experience over the course of bringing several attorney fee petitions in federal court over the past several years. In my opening declaration, I pointed out a series of federal court decisions awarding me attorney fees: *Pacificans For A Scenic Coast v. Cal. DOT*, No. 15-02090, 2017 U.S. Dist. LEXIS 199145 (N.D. Cal. Nov. 22, 2017); *Our Children's Earth Foundation v. National Marine Fisheries Service*, No. 14-01130, 2017 U.S. Dist. LEXIS 29130 (N.D. Cal. Mar. 1, 2017); *Our Children's Earth Foundation v. U.S. Environmental Protection Agency*, No. 13-02857, 2016 U.S. Dist. LEXIS 40626 (N.D. Cal. Mar. 25, 2016)); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv. ("SYRCL")*, No. 06-2845, 2012 U.S. Dist. LEXIS 42287, at *9 (E.D. Cal. Mar. 26, 2012), *aff'd* 2014 U.S. App. LEXIS 12450 (9th Cir. July 1, 2014); *San Francisco Baykeeper v. West Bay Sanitary District*, No. C-09-5676, 2011 U.S. Dist. LEXIS 138093, at **20-26 (N.D. Cal. Dec. 1, 2011) (Dkt. 174). In my fee petitions in these cases, like here, I pointed to case outcome data of fee awards to attorneys from law firms of varying sizes. I did not see substantial differences between the rates awarded larger firms and smaller firms in the data I presented and the courts in these cases awarded me and my co-counsel rates comparable to those awarded larger firms.

### IV. Alternative Lodestar If Clerical Rates Imposed

16. While Plaintiffs disagree that their time the Ogle Declaration codes in red is clerical work, as noted in Plaintiffs' Reply Brief, Plaintiffs contend in the alternative that this time should at least be compensated at clerical rates set at half of their paralegal rates. Such reduced clerical rates would be: $125 per hour for any paralegal work done by any staff with 20 or more years of legal experience (myself, Dawn Edberg), $115 per

DECLARATION OF CHRISTOPHER SPROUL 11 CASE NO. 16-cv-03869-DOC-PLA

1  hour for any staff with ten or more years but less than 20 years of legal experience
2  (Jodene Isaacs, Patricia Linn, Jason Weiner, Amy Mar), and $100 per hour for any staff
3  with less than 10 years of experience (Geneva Thompson, Heather Kryczka, and Molly
4  Coyne). In the attached Exhibit 11, I have set forth what the reduction in lodestar would
5  be for each attorney if their time that the Ogle Declaration codes in red were billed at
6  these reduced clerical rates. As further depicted in Exhibit 11: after the additional billing
7  judgment cuts for attorney time entries that United codes in red, Plaintiffs' attorneys fee
8  lodestar for all the time entries that the Ogle Declaration codes in red is $229,455.63 and
9  the paralegal time lodestar for these entries is $34,102—for a grand total lodestar for
10 these entries of $263,558.63. If the rate for all of these entries were reduced to the above
11 listed clerical rates, the lodestar for all the time entries that the Ogle Declaration codes in
12 red would instead be $43,902.45 and the paralegal time lodestar for these entries would
13 be $17,051—for a reduced grand total lodestar for these entries of $60,953.45. Thus, if
14 all these entries the Ogle Declaration codes in red were billed at a clerical rate, then
15 Plaintiffs' total fees lodestar would be reduced by $202,605.18 ($263,558.63 minus
16 $60,953.45).

### V.  Miscellaneous

17.  In reviewing United's Opposition Brief and the Ogle Declaration, I noted that United contradicted itself in its contentions concerning what Plaintiffs' attorney fee award should be. United's Opposition Brief (at 2, 24) contends that the Court should reduce Plaintiffs' fee award to $2,105,048.92, but the Ogle Declaration (at ¶ 45) contends that the award should be reduced to $2,090,312.30. In light of this math error, I directed Plaintiffs' contract paralegal Dawn Edberg to add up the suggested lodestar cuts for the different color-coded categories of billing reductions in the Ogle Declaration. Ms. Edberg discovered that the lodestar reductions stated attorney by attorney in the Ogle Declaration do not add up to either of the two figures United stated (instead, they added up to a revised Plaintiffs' lodestar of $2,096,902.30). Ms. Edberg further discovered that when she added up the lodestar reductions that the Ogle Declaration suggested line by line per

1  color code category, the sums that she calculated did not match the summaries in the
2  Ogle Declaration by category. For example, the Ogle Declaration ¶ 33 states that the cuts
3  in Mr. Weiner's time that it codes in red add up to 279.62 hours. However, if one adds up
4  (as Ms. Edberg did) the line by line reductions for entries that United codes in red in
5  Exhibit 13 of the Ogle Declaration, they only add up to 270.28 hours. For further
6  example, the Ogle Declaration ¶ 33 indicates that United's suggested cuts in Mr.
7  Weiner's gold coded time add up to 30.1 hours, but the line by line reductions in Exhibit
8  13 only add up to 26.7 hours. The Ogle Declaration indicates that its suggested cuts in
9  Mr. Weiner's grey coded time add up to 10.2 hours, but the line by line reductions only
10 add up to 6.9 hours. None of the Ogle Declaration's summary of the lodestar cuts for the
11 various color codes for Mr. Weiner's time add up to the true values if one were to
12 calculate the line by line reductions as the Ogle Declaration codes them in Exhibit 13
13 (except for the light green category--where the Ogle Declaration summary in ¶ 33 and the
14 line by line color coding both at up to 55.52 hours and a suggested lodestar cut of
15 $33,312).

16   18.   In reviewing United's Opposition Brief, I noted that United contended that
17 "Plaintiffs' counsel made no meaningful effort to reduce their time for work performed
18 by several attorneys on particular activities." Opp. at 5. I knew this not to be a true
19 statement. I spent several hours reviewing all of Plaintiffs' time records in this case and
20 cutting or reducing numerous time entries that involved Plaintiffs' counsel working
21 together on given tasks. I further spent extensive time discussing such billing judgment
22 reductions with my co-counsel, especially Jason Weiner. I requested Plaintiffs' contract
23 paralegal Dawn Edberg to review Plaintiffs' time records and produce a list of time
24 record entries involving Plaintiffs' counsel communicating with each other about joint
25 tasks that I and my co-counsel cut or reduced for billing judgment. A true and correct
26 copy of this itemized list of billing judgment reductions is set forth as Exhibit 12.

27
28

1  Executed in San Francisco, California on February 18, 2019.

*Christopher A. Sproul*
_____
Christopher Sproul
Attorney for Plaintiffs